UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:15-CV-00234-TBR

DOUGLAS W. GREENE                                                    PLAINTIFF

v.

IPA/UPS SYSTEM BOARD OF ADJUSTMENT                  DEFENDANT

and

UNITED PARCEL SERVICE CO. and            INTERVENOR DEFENDANTS
INDEPENDENT PILOTS ASSOCIATION

### Memorandum Opinion

This case and its companion cases, *Greene v. Frost Brown Todd, LLC, et al.*, No. 3:14-CV-00619, and *Greene v. Independent Pilots Association, et al.*, No. 3:14-CV-00628, arise from Plaintiff Douglas W. Greene's dismissal from his employment as a pilot for UPS.   In this case, Greene seeks to overturn the IPA/UPS System Board of Adjustment's determination that he was properly terminated for cause. Currently before the Court are Intervenor Defendants United Parcel Service Co.'s and Independent Pilots Association's motions for summary judgment.   [DN 12; DN 22.]   Greene has responded, [DN 50], and both UPS and IPA have replied [DN 72; DN 70.]   Greene also submitted two additional documents raising new arguments not contained in his initial response, which effectively functioned as sur-replies filed without leave of the Court. [DN 75; DN 79.]   The Court allowed IPA and UPS to respond to those additional filings, and they have.   [DN 86; DN 87; DN 91; DN 93.] Fully briefed, this matter is ripe for adjudication.

For the following reasons, UPS's and IPA's motions for summary judgment are GRANTED.  [DN 12; DN 22.]   After Greene was terminated from UPS, the Railway Labor Act and the UPS-IPA Collective Bargaining Agreement (CBA) required him to submit his termination grievance to the System Board of Adjustment for binding arbitration.   The System Board determined that Greene was rightfully terminated for insubordination after he refused to undergo an additional medical examination, which UPS ordered pursuant to the CBA.   This Court may overturn the System Board's Award upon only three grounds: "(1) failure of the Adjustment Board to comply with the requirements of the Railway Labor Act; (2) failure of the Adjustment Board to conform, or confine, itself to matters within the scope of its jurisdiction; and (3) fraud or corruption."   *Union Pacific Railroad Co. v. Sheehan*, 439 U.S. 89, 93 (1978) (citing 45 U.S.C. § 153 First (q)).   UPS and IPA have shown, and Greene has failed to rebut, that no genuine dispute of material fact exists with respect to any of these three grounds of review.   In deciding that Greene was properly terminated for cause, the System Board complied with the Railway Labor Act, acted within its jurisdiction, and did not engage in fraud or corruption.   Therefore, UPS and IPA are entitled to summary judgment.

# I. Facts and Procedural History[1]

United Parcel Service is a worldwide cargo company, shipping thousands of packages around the globe each day.   As part of this operation, headquartered in Louisville, Kentucky, UPS employs over 2,500 pilots.   [DN 19-15 at 9.]   In 2013, Plaintiff Douglas W. Greene was one of these pilots, as he had been for nearly twenty years prior.   [*Id*. at 8.]   By all accounts, Captain Greene was an exemplary pilot, routinely flying large jets along international routes.   [*Id*. at 13-14.]   Even UPS System Chief Pilot Roger Quinn, the company official who ultimately terminated Greene's employment, "describe[d] Captain Greene . . . as doing his job well and [as] a pleasure to work with."   [*Id*. at 14.]   Greene was also politically active within the company, opposing the leadership of the Independent Pilots Association, the union that represents UPS's pilots.   [*Id*.]   Several years earlier, a group of pilots led by Greene were successful in fending off tax assessments by the Kentucky Department of Revenue.   [*Id*.]   Greene believes that UPS and IPA were allied against the pilots, and against Greene personally, with regard to the Kentucky tax investigation.   [*Id*.]

The circumstances giving rise to Greene's termination, the subject matter of this case, began on March 19, 2013.[2]   [*Id*. at 15.]   On that date, Greene was

---

[1] "[R]eviewing courts are bound by the facts as found by the arbitrator . . . ."   *NetJets Aviation, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 486 F.3d 935, 937 (6th Cir. 2007).   In the context of the Railway Labor Act, discussed at length below, "the findings and order of the division of the Adjustment Board shall be conclusive on the parties."   45 U.S.C. §§ 153 First (p)-(q).   As such, "the following summary is largely based on the fact statement in the decision of the Board."   *NetJets Aviation*, 486 F.3d at 937.

[2] Prior to his 2013 termination, Greene was subjected to termination proceedings in 2011 that did not result in his dismissal.   [*Id*. at 9.]   UPS sought to introduce evidence pertaining to the 2011 termination during the arbitration hearing in this case, but Arbitrator Winograd excluded that

exercising jump seat privileges on a Federal Express flight from Memphis, Tennessee to his home in Anchorage, Alaska.[3]   [*Id*.]   At the conclusion of the flight, a FedEx security officer "confiscated a pair of small scissors with pointy ends" from Greene's personal belongings.   [*Id*. at 15-16.]   Although these scissors were not prohibited by Transportation Safety Administration guidelines, FedEx's internal security protocols barred their possession.   [*Id*. at 16.]   Having previously carried the scissors on jump seat flights before, Greene was unaware that the scissors were not allowed.   [*Id*.]   By all indications, Greene behaved appropriately and respectfully towards FedEx officials during this incident.   [*Id*.]

Shortly thereafter, FedEx security sent a report to UPS describing the incident, and returned the scissors to Assistant Chief Pilot Jim Psiones, the head of Greene's Anchorage duty station.   [*Id*. at 16-17.]   Psiones gave the scissors back to Greene while Greene "was in a crew room with other pilots," mentioning to Greene "some type of security report."   [*Id*. at 17.]   Greene took issue with Psiones bringing up the occurrence in the presence of his coworkers, telling him that such matters should be addressed in private.   [*Id*.]   Eventually, Chief Pilot Quinn was made aware of the scissor incident, and asked that a notation be made on Greene's Exception History Report, or EHR.   The EHR is a non-disciplinary part of each UPS crewmember's employment record that makes note of various occurrences, such as work absences.   *See, e.g.*, [DN 13-6.]   A notation regarding the scissor

---

evidence on the basis of relevance.   [*Id*.]   However, in post-hearing briefs, Greene and IPA argued that the 2011 termination "contribut[ed] to [Greene's] subsequent state of mind in fearing that a fitness exam would have been a prelude to dismissal."   [*Id*.]

[3] As a matter of professional courtesy, air carriers routinely allow pilots employed by other carriers to ride along in the jump seat, a spare fold-down seat in the aircraft's cabin.

incident was made on Greene's EHR on May 21, 2013, by Anchorage Chief Pilot Ed

Faith.   [*Id.* at 3-4.]   The EHR notation stated, as quoted by Arbitrator Winograd

[sic throughout]:

> ups was notified by one fedex operator that during the screening
> process for mr. greene's requested jumpseat, a pair of scissors was
> discovered.  this is a prohibited item!  when asked about the scissors,
> mr. greene stated that "no one else seems to have a problem with
> them."  the scissors were surrendered and later recovered by anc acp
> jim psiones.  this is unacceptable behavior on the part of mr. greene
> and could jeopardize future jumpseat travel for ups pilots on fedex.

[*Id.*]   In a separate section, the EHR notation stated:

> both jim psiones and ups security rep ken murray have spoken with
> mr. greene.  he has been advised that his actions and confrontational
> behavior are unacceptable and not to have it happen again.  entered
> by anc cp ed faith. . . .  in a conversation subsequently with capt.
> greene, he did not seem to take the issue seriously and had negative
> opinions on the performance of the security staff at fedex and stated he
> has been through there (fedex) with those scissors several times with
> no problems.  in short, capt. greene  marginalized the event and
> always had a response justifying his actions.  capt. greene took
> exception to my bringing the issue forward in the crew room.  it was
> not my intent to address the issue openly.  I was left with no options
> once capt. greene began talking and never stopped to listen.   j psiones

[*Id.*]

Greene took exception to the EHR notation, feeling that it did not accurately

recount the scissor incident and the conversations that followed.   [DN 19-15 at 19.]

Over the summer, Greene attempted to have the notation removed from his EHR,

contacting UPS managers, IPA representatives, Chief Pilot Quinn, and the chief

pilot of FedEx.   [*Id.*]   Greene also filed a complaint with the Transportation Safety

Administration "alleging that ACP Psiones falsely told him the incident was

reported to the TSA, although Captain Greene had been told by another manager

that a TSA report had not been made." [*Id.* at 21-22.] While Chief Pilot Quinn ultimately decided that the notation would remain, he added an amendment stating that Greene had behaved courteously towards FedEx security during the scissor incident. [*Id.* at 19-20.]

Apparently, Greene's reaction to the scissor incident and the EHR notation caused his UPS supervisors to become concerned about his behavior. "In one exchange, Chief Pilot Quinn said that Captain Greene should be kept 'in our sites' [sic] after being informed of Captain Greene's continuing disagreement with the EHR." [*Id.* at 21.] Psiones also took issue with Greene's challenge to the EHR notation, as well as Greene's aforementioned complaint against Psiones to the TSA. [*Id.*] To address these internal concerns, UPS management held a meeting on August 22, 2013, which Anchorage Chief Pilot Ed Faith, IPA representative Wayne Jackson, and Greene attended. [*Id.* at 22.] During that meeting, the other parties "realized that Captain Greene was tape-recording what was said." [*Id.*] Greene then admitted he had previously recorded conversations with UPS security officer Ken Murray on June 18 and with a local UPS manager on August 13. [*Id.*] During his direct examination at the arbitration hearing, Greene stated that these were the only recordings he made of conversations with UPS officials. [*Id.*] "However, on cross-examination, Captain Greene acknowledged that he had withheld a tape he made of a June 13 conversation with a Company manager," ostensibly to catch UPS officials in a lie. [*Id.* at 22-23.]

Arbitrator Winograd quoted Greene's taped statements at length in his written decision, as UPS cited the statements as support for its belief that Greene's behavior warranted an additional medical examination.   [*Id.* at 23.]   In the June 18 conversation with Murray, Greene discusses at length his belief that UPS, IPA, and the Kentucky Department of Revenue are conspiring against UPS pilots in general, and Greene in particular, regarding the tax assessments.   For example, Greene says:

> I think this is really about another issue, and I'm not going to go into detail about it.   It's more about an attack on our pilot group by the state of Kentucky and Doug Greene trying to help our pilots to know how to defend themselves against rights violations.   I didn't serve 22 years in the military to have a corrupt government try to deny us our rights. . . .   But, you know, I don't understand what's going on here.   I mean, I guess the company doesn't think pilots should defend themselves against corrupt government that fraudulently try to extort money out of you, but we have no choice.   We didn't ask for this fight, Ken.   Our own union started this mess because they turned in one of our own executive board members because they spoke the truth about the last contract and they gave information about him to the Kentucky Department of Revenue.

[*Id.* at 24-25.]   In the aforementioned August 22 meeting, Greene again brought up the Kentucky tax investigation, saying that he believed it was the reason UPS sought to terminate him in 2011.   Here, Greene begins by speaking as if he is standing in the shoes of UPS:

> So, subsequently, this guy is crazy.   We know he's crazy and he knows he's crazy.   He's violated our pilots' rights.   They've targeted us just like they did the IRS targeted the Tea Party groups.   They know we know it now.   We don't want bad press for the company.   We don't want it. The company probably should have challenged the jurisdiction of the subpoena.   They didn't do it, but – you know, but they didn't give up any money except IPA pilots even though it says pilot employees of UPS. . . .   We can't have people put under duress

> flying airplanes because of corrupt governments abusing their powers, so I fought back.   And I was terminated because of this.
>
> This came out in the arbitration hearing when I was terminated, okay, with Tony Coleman [counsel for UPS] when he talked to Bill Trent [counsel for IPA].   It came out that's why I was fired because of this.   You know why?   Because when UPS started getting subpoenas coming across their desk, not just this one, but specific subpoenas with Doug Greene's name on it, it tarnished my perfect 19-year career with this company, and it is perfect.

*Id*. at 27.   On two occasions, Anchorage Chief Pilot Faith attempts to interject, claiming that he "know[s] nothing about any of that."   [*Id*. at 29.]

The parties also discussed Greene's recurring back injury during the August 22 meeting.   In the words of Arbitrator Winograd, Greene's statements "strongly suggest[ed] Captain Greene's readiness to take painkilling drugs and injections so that he could carry out work-related duties without, if possible, taking time off." [*Id*. at 30.]   Particularly, Greene mentioned a back injury he suffered in 1994 that "never went away," saying that he "managed it for 20 years" before reinjuring himself in 2012.   [*Id*.]   Greene stated that he had received epidurals and a steroid pack in order to lessen his pain.   [*Id*. at 31.]

Following the meeting, Chief Pilot Quinn "decided to remove Captain Greene from service, placing him on paid administrative leave while further action was considered."   [*Id*. at 33.]   UPS conducted two follow-up predisciplinary hearings on September 11 and October 16.   [*Id*.]   Internally, UPS officials were communicating about Greene's situation, their emails "support[ing] an inference that at least some managers saw the continuous efforts of Captain Greene in challenging the EHR report as an opportunity to retaliate against him."   [*Id*. at

8

34.]   However, during these discussions, Chief Pilot Quinn "spoke favorably of Captain Greene's experience and character." [*Id.*]   As part of its internal investigation, UPS security also received three emails from other UPS pilots.  They recounted several instances in which Greene had spoken out vociferously and sometimes irrationally against UPS, IPA, Jim Psiones, and the Kentucky Department of Revenue.  [*Id.* at 35.]   On one occasion, Greene said to another pilot that he believed UPS had hired someone to kill him.   [*Id.*]

UPS's meetings with Greene, the company's internal investigation, and Greene's own recorded statements prompted Chief Pilot Quinn in October 2013 to require Greene to undergo a special medical examination, as provided for in Article 5.D of the Collective Bargaining Agreement.   "Captain Greene's obsessive focus on the scissor incident . . . and his association of the EHR report with actions by the Company, the Union, and Kentucky revenue officials, raised concerns on [Quinn's] part regarding Captain Greene's connection to reality and his ability to safely function as a pilot."   [*Id.* at 36.]   Additionally, Quinn "also had questions about Captain Greene's longstanding back injury and how it had been handled."   [*Id.* at 37.]

UPS arranged for an experienced aviation medical examiner (AME) in Anchorage to carry out the exam.   [*Id.*]   This AME had previously completed Greene's routine FAA medical exams. [*Id.*]   According to Greene, the AME "intended to conduct a full physical examination, draw a blood sample, carry out a urine analysis for drug screening, ask simple cognitive questions, and take a family

history." [*Id*.]   However, IPA filed a grievance on Greene's behalf, arguing that UPS had insufficient evidence to warrant an additional exam under the terms of the CBA. [*Id*. at 37-38.]   As such, Greene twice refused to submit himself to the medical exam, once on November 2, and again on November 7. [*Id*. at 37.]   UPS afforded Greene a third opportunity to submit to the exam in mid-November, giving Greene a weekend to think the matter over, but he again refused. [*Id*. at 39.] Before the third opportunity, UPS offered to hold another pre-disciplinary hearing, but Greene waived that hearing through IPA counsel. [*Id*. at 41.]   Before each of the final two opportunities for an examination, UPS expressly warned Greene that further refusal would result in his termination. [*Id*. at 38-39.]

Greene offered several justifications for his refusals. As previously mentioned, both he and IPA believed that UPS had insufficient evidence to order the medical exam under the terms of the CBA.   Additionally, "Captain Greene expressed concern that the AME would find something wrong and recommend a second evaluation, and that the multi-level review process under [the CBA] was insufficient protection because the Union would not be serving his interests." [*Id*. at 38.]   Finally, during the arbitration hearing, Greene admitted that he declined the final opportunity to be examined because he "was going through an interview in Korea and [he] wanted to get another job before [UPS] terminated [him]." [*Id*. at 40.]   Accordingly, and pursuant to UPS's previous warnings, Greene was terminated for insubordination by Chief Pilot Quinn on November 22, 2013. *See* [DN 15-8.]

IPA filed a grievance on Greene's behalf, contending that his termination violated the CBA.   Typically, the CBA requires labor grievances to be resolved by the System Board of Adjustment, a panel consisting of two IPA representatives and two UPS representatives.   [DN 13-1 at 94.]   If that panel is deadlocked, a third-party neutral arbitrator is added to break the tie.   [DN 13-2 at 2.]   However, in cases involving an employee's discharge, the employee may, at his election, proceed directly to the five-member System Board.   [DN 13-1 at 89.]   Here, IPA requested in its grievance that Greene's case proceed directly to arbitration, and Greene's counsel did not object.   [DN 22-2 at 8-9.]

After negotiation between the parties, including the replacement of the first two neutral arbitrators chosen to serve, the parties eventually settled upon Barry Winograd to serve as the third-party neutral.   The hearing was held September 15-17, 2014, in Louisville, Kentucky.   [DN 19-15 at 3.]   The parties agreed that the arbitration would decide the following questions: "Was the grievant dismissed with just cause; if not, what is the appropriate remedy?"   [*Id*. at 4.]   Just cause is required to dismiss an employee under CBA Article 8.F.2.   [*Id*.]   At the hearing, Greene was represented his own counsel, Arnold Feldman, and IPA.   [*Id*.]

Greene made several motions prior to the hearing.   Greene moved "that a videographer be used, that a second reporter transcribe the hearing, that the Union be disqualified as the grievant's representative, and that the grievant, not the Union, should designate one or more members of the System Board."   [*Id*. at 3-4.]

Arbitrator Winograd denied all these motions, and also resolved outstanding scheduling and discovery disputes.   [*Id*.]

After hearing the testimony presented by the parties, reviewing the submitted evidence, and receiving post-hearing briefs, the System Board issued its Opinion and Award on March 20, 2015.   Both UPS Board members concurred in the decision, and both IPA members dissented.   Ultimately, in a decision authored by Arbitrator Winograd, the Board determined that UPS had just cause to terminate Greene for insubordination.   Winograd found that UPS conducted a "sufficiently fair and thorough" investigation, [*id*. at 47], and pointed towards several facts constituting "objective evidence" of Greene's medical issues: his acknowledgment of a long-standing back injury, his use of painkilling drugs to treat that injury, his "unrelenting and wildly speculative" statements during discussions with UPS's managers, and his fixation on the scissor incident and subsequent EHR notation.   [*Id*. at 50-52.]   Because UPS had cause to believe Greene was experiencing medical problems that could impair his ability to fly, its directive that Greene submit to an additional medical exam was justified under the CBA.   [*Id*. at 50.]   In turn, Greene's refusal on three occasions to undergo the medical exam constituted insubordination, for which Chief Pilot Quinn rightfully terminated Greene.   In Winograd's words, Greene's failure to submit to the third opportunity for an exam "resolve[d] any doubt that he was engaged in occupational self-destruction beyond the remedial authority" of the System Board.   [*Id*. at 55.]   The Board found no evidence that UPS terminated Greene because of bias and hostility

towards him or because of his political views, nor did it find evidence of collusion between IPA and UPS.   [*Id.* at 54-56.]

Greene filed the instant action on March 30, 2015, seeking to overturn the System Board of Adjustment Award.   [DN 1.]   He named as defendant the "IPA/UPS System Board of Adjustment."   [*Id.*]   UPS and IPA moved to intervene, arguing that under the doctrine of *functus officio*,[4] "the Arbitration Board ceased to exist once it issued its final and binding decision on March 20, 2015."   [DN 6 at 4; DN 10].   The Court granted both motions, [DN 11], and the Intervenor Defendants moved for summary judgment, [DN 12; DN 22].

Greene responded to UPS's and IPA's motions for summary judgment, [DN 50], and UPS and IPA replied, [DN 70; DN 72].   He then filed two documents entitled "Plaintiff's Notice of Filing Addressing Intervenor Fraud Upon the Court in Their Replies to Plaintiff's Response to Defendant's Motion for Summary Judgment," and "Plaintiff's Notice of Filing Addendum of Perjury for Plaintiff Response to Defendant's Motion for Summary Judgment," respectively.   [DN 75; DN 79.]   These documents raised new arguments not contained in Greene's initial response, and essentially functioned as sur-replies filed without leave of the Court. The Court permitted IPA and UPS to respond to these filings, and they did.   [DN 86; DN 87; DN 91; DN 93.]   Fully briefed, this matter is now ripe for adjudication.

---

[4] "[W]ithout further authority or legal competence because the duties and functions of the original commission have been fully accomplished."   *Functus Officio*, Black's Law Dictionary (10th ed. 2014).

## II. Standard of Review

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52). As the parties moving for summary judgment, UPS and IPA must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Greene's claim. Fed. R. Civ. P. 56(c); see *Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming UPS and IPA satisfy their burden of production, Greene "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

14

## III. Discussion

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  When Congress grants the federal courts jurisdiction to hear a particular cause of action, it may limit the extent to which courts can review the plaintiff's claim.  Such is the case here.  This case arises under the Railway Labor Act, a federal law that, among other things, requires certain labor disputes in the railroad and airline industries to be submitted to mandatory, binding arbitration.  44 Stat. 577, as amended, 45 U.S.C. § 151 *et seq.*  As part of this scheme, parties who are dissatisfied with the outcome of an RLA arbitration may petition a United States district court to vacate the decision.  *Id.* §§ 153 First (p)-(q).  At the same time, however, Congress limits the available grounds of review.  Federal courts may only set aside an RLA arbitration for "(1) failure of the Adjustment Board to comply with the requirements of the Railway Labor Act; (2) failure of the Adjustment Board to conform, or confine, itself to matters within the scope of its jurisdiction; and (3) fraud or corruption."  *Union Pac. R. Co. v. Sheehan*, 439 U.S. 89, 93 (1978).  Otherwise, the court must uphold the arbitration award, even if the court believes the decision was factually erroneous.

In this case, Greene seeks to vacate the System Board of Adjustment Award that upheld his termination by UPS.  Because Greene presents no genuine issue of material fact with respect to any of the three aforementioned grounds for review, this Court must grant summary judgment in favor of UPS and IPA.  The evidence

of record demonstrates that the System Board complied with the RLA, confined itself to its jurisdiction under the parties' Collective Bargaining Agreement, and did not engage in fraud or corruption.   Therefore, this Court must uphold the System Board's Award, and may not inquire into Greene's factual disagreements with the System Board.

A. Railway Labor Act

The Railway Labor Act, 44 Stat. 577, as amended, 45 U.S.C. § 151 *et seq.,* provides a "comprehensive framework for the resolution of labor disputes in the railroad industry." *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 (1987).   It was enacted by Congress in 1926 "to promote peaceful and efficient resolution" of such disputes.   *Union Pac. R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 72 (2009) (citation omitted).   The RLA "instructs labor and industry 'to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise.'"   *Id.* (quoting 45 U.S.C. § 151 First).   The Supreme Court has described the obligation of labor and industry to pursue agreement as the "heart of the Railway Labor Act."   *Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 377–378 (1969).

Initially, the RLA applied only to rail carriers, but Congress soon amended the statute to include air carriers as well.   74 Pub. L. No. 487 (1936), 49 Stat. 1189; 45 U.S.C. § 181.   As amended, there are some noteworthy differences between the

16

dispute resolution schemes for rail carriers and air carriers.  Section 153 of the RLA established the National Railroad Adjustment Board ("NRAB") to ultimately adjudicate railroad labor disputes.  However, when Congress extended the RLA's application to air carriers, it specifically precluded the NRAB from reviewing airline labor disputes, the theory being that those disputes should be heard by "boards of adjustment particularly suited to their industry."  *Edwards v. United Parcel Serv., Inc.*, 16 F. App'x 333, 338 (6th Cir. 2001); *see* 45 U.S.C § 181.  Instead, air carrier labor disputes are adjudicated under § 184.  That RLA section puts the onus upon "every carrier and . . . its employees . . . to establish a board of adjustment" to adjudicate labor disputes.  *Id*. § 184.  Adding a further wrinkle, § 184 provides that these individually-established adjustment boards shall have "jurisdiction not exceeding the jurisdiction which may be lawfully exercised by system, group, or regional boards of adjustment, under the authority of section 153 of this title."  *Id*.  So in the end, the jurisdiction of the air carrier adjustment boards is defined by § 153, the very section that § 181 says does not apply to air carriers.

The bottom line is this: railway labor disputes are adjudicated by the NRAB, and airline labor disputes are adjudicated by adjustment boards established by agreement between air carriers and their employee representatives.  In either case, the jurisdiction of the particular adjustment board is defined by § 153.  As such, "the same standards that govern review of an NRAB award apply when a court reviews an award issued by a 'special adjustment board[,]'" in this case, the IPA/UPS System Board of Adjustment.  *Bhd. of Locomotive Eng'rs & Trainmen v.*

*United Transp. Union*, 700 F.3d 891, 899 (6th Cir. 2012) (quoting *Cole v. Erie Lackawanna Ry. Co.,* 541 F.2d 528, 531-32 (6th Cir. 1976)).

At its core, dispute resolution under the RLA is a matter of agreement between the carrier and its employees.   That agreement, the collective bargaining agreement, "is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate."   *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 578 (1960) (citation omitted).   "A CBA's objective is 'to erect a system of industrial self-government' that permits the relationship between the parties to be 'governed by an agreed-upon rule of law.'"  *United Transp. Union*, 700 F.3d at 899-900 (quoting *United Steelworkers*, 363 U.S. at 580).   "[The] effectuation [of the CBA] demands the development of a common law of the shop which implements and furnishes the context of the agreement."   *Id.* at 900 (internal quotations omitted).

Labor disputes under the RLA are classified as either major or minor disputes.   A "minor dispute" is one that "involves the application or interpretation of an existing collective-bargaining agreement."   *W. Airlines, Inc. v. Int'l Bhd. of Teamsters*, 480 U.S. 1301, 1302 (1987).   Although the case before the Court has significant ramifications for the parties involved, the RLA classifies Greene's termination as a minor dispute.   *See Kaschak v. Consol. Rail Corp.*, 707 F.2d 902, 905 (6th Cir. 1983) (appellant's claim of wrongful discharge under terms of a collective bargaining agreement was a minor dispute).   In minor disputes, the RLA requires employees and carriers "to exhaust the grievance procedures specified in

the collective-bargaining agreement" before resorting to arbitration.   *Union Pac. R. Co.*, 558 U.S. at 73.   If the parties to a collective bargaining agreement are unable to resolve a minor dispute, the final step under the RLA is mandatory, binding arbitration.   "Congress included a mandatory arbitral mechanism in the statute to efficiently resolve labor disputes, promote stability in the relationship between rail companies and their employees, and keep such disputes out of the courts."   *United Transp. Union*, 700 F.3d at 899 (citing *Sheehan*, 439 U.S. at 94).   This mechanism "is unique to the RLA and is not found in the other major federal labor relations statute that covers private sector employees."   *Id.*   RLA arbitration awards are "final and binding upon both parties to the dispute."   45 U.S.C. § 153 First (m).

### B. Judicial Review Under the RLA

Judicial review of RLA arbitrations is extremely limited.   Indeed, courts have characterized the scope of this review as "among the narrowest known to the law."   *Jones v. Seaboard Sys. R.R.*, 783 F.2d 639, 642 (6th Cir. 1986) (citation omitted).   The RLA provides, in pertinent part:

> "On such review, the findings and order of the division shall be conclusive on the parties, except that the order of the division may be set aside, in whole or in part, or remanded to the division, for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order."

45 U.S.C. § 153 First (q).

The Sixth Circuit has held that this scope of review "is narrower even than the highly deferential abuse of discretion standard."   *Seaboard Sys.*, 783 F.2d at

642 (citation and internal quotation marks omitted). "In order to set aside the Board's decision, [the court must] determine that the decision was 'wholly baseless and without foundation and reason.'" *Schneider v. S. Ry.,* 822 F.2d 22, 24 (6th Cir. 1987) (quoting *Gunther v. San Diego & Arizona E. Ry.,* 382 U.S. 257, 264 (1965)). "[S]uch limited review respects the intent of the parties who specifically bargained for [the arbitrator's] judgment and all that it connotes. . . .  In the final analysis, [the arbitrator's] judgment must not be disturbed so long as it draws its essence from the [CBA]." *Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*, 700 F.3d 891, 900 (6th Cir. 2012) (internal quotation marks and citations omitted).

The seminal case regarding the scope of review of RLA arbitrations is *Union Pacific Railroad Co. v. Sheehan*, 439 U.S. 89 (1978).  There, the Tenth Circuit had vacated an Adjustment Board decision because it believed the Board had denied the plaintiff due process in reviewing his termination. *Id*. at 91. A unanimous Supreme Court reversed the Tenth Circuit, stating that "[the RLA's] statutory language means just what it says." *Id*. at 93 (citations omitted).  The Court held that Adjustment Board orders may only be reviewed for "(1) failure of the Adjustment Board to comply with the requirements of the Railway Labor Act; (2) failure of the Adjustment Board to conform, or confine, itself to matters within the scope of its jurisdiction; and (3) fraud or corruption." *Id*. (citing 45 U.S.C. § 153 First (q)).

Because this Court's power to review the System Board's Award is circumscribed in Greene's case, as in every similar case, the Court can quickly

dispense with Greene's second claimed ground for overturning the System Board. In his Petition, Greene claims that the System Board violated his Fifth Amendment due process rights by improperly making and supporting credibility findings, by failing to cite supporting law or precedent, and by impermissibly relying upon hearsay statements. [DN 3-1 at 2.] But under *Sheehan*, this Court is not permitted to review the System Board's Award to see if the Board afforded Greene proper due process. This implicit holding from *Sheehan* has been explicitly stated by several circuit courts, including our own.[5] *See, e.g., Jones v. St. Louis-San Francisco Ry. Co.*, 728 F.2d 257, 261 (6th Cir. 1984) ("[A] due process violation . . . cannot serve as a basis for judicial review in this context."). Therefore, this Court must limit its review of the System Board's Award to the three grounds stated in 45 U.S.C. § 153 First (q). "If [Greene] cannot satisfy any of these three grounds, review cannot be granted." *Seaboard Sys.*, 783 F.2d at 642 (citing *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 325 (1972)).

In his Petition, Greene claims only that the System Board exceeded its jurisdiction, the second ground for review listed in 45 U.S.C. § 153 First (q). However, at various points in his voluminous filings on these motions, Greene does allege that the System Board violated the Railway Labor Act and that the Board's decision was a product of fraud and corruption. In the interest of thoroughness, the Court will address all three grounds.

---

[5] The Court recognizes that other circuits allow due process review of RLA arbitrations. *See, e.g., Shafii v. PLC British Airways*, 22 F.3d 59, 64 (2d Cir. 1994) (review available); *Edelman v. Western Airlines, Inc.*, 892 F.2d 839, 847 (9th Cir. 1989) (same). But the Sixth Circuit does not, and the Court is bound by that interpretation of 45 U.S.C. § 153 First (q) and *Sheehan*.

(1) *Violations of the RLA*

First, Greene may prevail in this case by showing that the System Board "fail[ed] . . . to comply with the requirements of the Railway Labor Act." *Union Pac. R. Co. v. Sheehan*, 439 U.S. 89, 93 (1978). A survey of the jurisprudence in this area reveals that courts rarely vacate RLA arbitrations on this ground. When they do, it is typically because the adjustment board in question failed to decide the merits of a case when the RLA required it to do so. For instance, in *System Federation, No. 30, Railway Employees' Department, AFL-CIO v. Braidwood*, a district court considered a case where the National Railroad Adjustment Board issued an Award refusing to decide the merits of a railroad employee's grievance. 284 F. Supp. 611 (N.D. Ill. 1968). The NRAB declined to rule on the merits because of an unresolved circuit split, making the correct outcome unclear. *Id.* at 614. Following a Supreme Court decision that resolved the split, the NRAB again refused to rule on the merits. *Id.* The union argued, and the district court agreed, that by failing to rule on the merits of the employee's grievance, the NRAB failed "to fulfill its duties under the Act, which include the effective and final decision of grievances presented to it." *Id.* at 616. *See also Bhd. of R. R. Signalmen v. Chicago, M., St. P. & P. R. Co.*, 284 F. Supp. 401 (N.D. Ill. 1968) (Board's failure to issue a final money award violated RLA).

Here, Greene does not point out which specific provisions of the RLA the System Board violated. Regardless, the System Board did not violate the RLA in this case. Unlike the cases cited above, the System Board issued a final decision

on the merits of Greene's employment grievance.   The sole issue the Board was convened to decide was whether UPS had just cause to terminate Greene, and the Board answered that question affirmatively.   When Greene states that the System Board and Arbitrator Winograd violated the RLA, Greene is essentially saying the Board and Winograd issued a decision with which he disagrees.   Greene raises no RLA violations that justify this Court's vacation of the System Board's Award.

(2) *Lack of Jurisdiction*

The second way Greene may prevail in this case is by showing that the System Board "fail[ed] . . . to conform, or confine, itself to matters within the scope of its jurisdiction." *Union Pac. R. Co. v. Sheehan*, 439 U.S. 89, 93 (1978).   The System Board's jurisdiction is limited to that which is conferred upon it by the CBA. *Jones v. St. Louis-San Francisco Ry. Co.*, 728 F.2d 257, 265 (6th Cir. 1984).   To determine whether the System Board had jurisdiction to decide a particular matter, this Court must look to see whether "the award drew its essence from the collective bargaining agreement." *Zeviar v. Local No. 2747, Airline, Aerospace & Allied Emp., IBT*, 733 F.2d 556, 559 (8th Cir. 1984) (citing *W.R. Grace & Co. v. Local 759, Int'l Union of Rubber Workers,* 461 U.S. 757 (1983)).   Stated otherwise, if "the court is satisfied that the arbitrators were interpreting the contract rather than doing something else," the jurisdictional inquiry ceases.   *Fine v. CSX Transp., Inc.*, 229 F.3d 1151, No. 99-1645, 2000 WL 1206526, at * 2 (6th Cir. Aug. 18, 2000) (unpublished table decision) (quoting *Hill v. Norfolk and W. Ry. Co.,* 814 F.2d 1192,

1197 (7th Cir. 1987)).  The Sixth Circuit has set out four ways in which an arbitrator might exceed his jurisdiction:

> An arbitrator's award will be overturned for failure to draw its essence from the agreement only where 1) the award conflicts with the express terms of the agreement, 2) the award imposes additional requirements that are not expressly provided in the agreement, 3) the award is without rational support or cannot be rationally derived from the terms of the agreement, or 4) the award is based on general considerations of fairness and equity rather than the precise terms of the agreement.

*Airline Prof'ls Ass'n of Int'l Bhd. of Teamsters, Local Union No. 1224, AFL-CIO v. ABX Air, Inc.*, 274 F.3d 1023, 1030 (6th Cir. 2001) (citation omitted).

If Greene's objections to the System Board's Award can be distilled to a single point, it is this: Greene contends that UPS was not permitted under the terms of the Collective Bargaining Agreement to require him to submit to an additional medical examination.   The relevant CBA provision, Article 5.D.1.a., provides:

> If there is objective evidence indicating that a crewmember has a medical problem which could interfere with his ability to safely function as a crewmember, the Company may require the crewmember to have a medical examination other than a routine FAA required physical examination.  A crewmember may be removed from duty with pay until the medical examination is completed.  Such removal from duty must be approved by the Chief Pilot.

[DN 13-1 at 52.]  The CBA further provides that the additional exam will be administered by a UPS-designated Aero Medical Examiner, and that UPS will pay the expenses of the examination.  [*Id.* at 52-53.]  If the UPS-designated AME determines that the crewmember is unfit to fly, Article 5.D.1.e allows the crewmember to seek a second opinion from his or her own doctor.  [*Id.* at 53.]  If

the two doctors disagree, Article 5.D.3 states that a third doctor whose opinion shall be final will be used to break the tie.   [*Id.* at 54.]

In this case, Arbitrator Winograd unquestionably interpreted the CBA in deciding that Greene's termination was justified, and the Court cannot disturb his interpretation.   Winograd begins his discussion by outlining the arguments presented by UPS, IPA, and Greene in some detail.   [DN 19-15 at 42-44.]   He then spends some seven pages evaluating the evidence presented by all parties through the lens of the CBA, in an effort to determine whether UPS had the necessary objective evidence to direct Greene to undergo an additional medical exam.   [*Id.* at 48-55.]   In doing so, Winograd necessarily had to interpret the CBA, as he does in the following passage from the Award:

> In analyzing Article 5.D, the scope of a medical examination authorized by that provision is other than a "routine" certification examination required by the FAA.   The text of Article 5.D expressly distinguishes one from the other, thus indicating that a special focus may underlie the Company's referral.   As Article 5.D also makes plain, the Company can exercise its prerogative based on an assessment by the chief pilot placing a pilot on leave from duty in conjunction with an examination directive.   Given this, there is no requirement under the agreement for a preliminary report by a doctor or a medical official.

[*Id.* at 48-49.]   Article 5.D.1.a, and particularly the phrase "a medical examination other than a routine FAA required physical examination," are indeed susceptible to multiple readings.   One could interpret the phrase as requiring "a medical exam [different in type] than a routine FAA required physical examination."   One could also read the phrase as meaning "a medical exam [in addition to] a routine FAA required physical examination."   And as Greene repeatedly points out, the CBA

also fails to define what constitutes "objective evidence." But the point of binding arbitration under the RLA is to save reviewing courts from deciding which interpretation of the CBA is the correct one. This Court's inquiry is limited to whether the "arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (citations and internal quotations omitted). Here, that is precisely what Arbitrator Winograd did.

By arguing that UPS did not possess objective evidence warranting an additional medical examination, Greene asks this Court to evaluate the factual correctness of Arbitrator Winograd's decision. But the Court's scope of review regarding the substance of the System Board's Award is limited to whether "the award is without rational support or cannot be rationally derived from the terms of the agreement." *ABX Air*, 274 F.3d at 1030 (citation omitted). In other words, unless the arbitrator's logic "was 'wholly baseless and without foundation and reason,'" this Court may not disturb the Award. *Schneider v. S. Ry. Co.*, 822 F.2d 22, 24 (6th Cir. 1987) (quoting *Gunther v. San Diego & Ariz. E. Ry.*, 382 U.S. 257, 264 (1965)). Upon a thorough review of the System Board's Award, the Court is satisfied that, based upon the evidence presented to the Board, Arbitrator Winograd's decision was not wholly baseless and without foundation, reason, or rational support. *Id*. As noted by Arbitrator Winograd, Greene's own statements, especially those regarding his willingness to take pain medication in order to fly, constituted much of the "objective evidence" cited by UPS. Winograd reviewed

26

those statements, as well as the other evidence, and reached the conclusion that UPS had the right under the CBA to require the exam.   Because at least some evidence exists supporting that conclusion, this Court must defer to the System Board.

Similarly, there is no indication that Arbitrator Winograd "impose[d] additional requirements that [were] not expressly provided in the agreement," or based his decision upon "general considerations of fairness and equity rather than the precise terms of the agreement."   *ABX Air*, 274 F.3d at 1030 (citation omitted). Rather, the record shows that Winograd heard testimony from multiple witnesses over the course of three days, received numerous exhibits, and considered argument from all involved parties.   He rendered a decision that, in his view, was the correct one, based upon the evidence and his reasoned interpretation of the CBA.   Even if this Court believed Winograd decided the case wrongly, it possesses no authority to overturn the Award.

Greene seeks to draw an analogy between his case and *Konop v. Hawaiian Airlines, Inc.*, No. 2:06-CV-04426 (C.D. Cal. Jan. 4. 2008), an order of a California federal district court vacating a System Board of Adjustment Award because that Board exceeded the scope of its jurisdiction.   However, the district court's decision was reversed by the Ninth Circuit in *Konop v. Hawaiian Airlines, Inc.*, 366 F. App'x 705 (9th Cir. 2009), *cert. denied*, 558 U.S. 1149 (2010).   In *Konop*, the parties' collective bargaining agreement "required notice of the precise charge or charges to the party," and Hawaiian Airlines did not provide the plaintiff with a statement of

the facts or evidence against him.  *Id*. at 706 (internal quotation marks omitted). The System Board found that the airline's statement of charges was sufficient under the CBA, but the district court vacated the Board's Award because the court believed Hawaiian Airlines' statement of charges was insufficient.  *Id.* at 706-07. The Ninth Circuit reversed the district court because the district court had, in effect, substituted its own interpretation of the CBA for that of the System Board. *Id*.  *Konop* lends further support to the notion that, "so long as the arbitrator is even *arguably* construing the contract, the reviewing court's view of the correctness of the arbitrator's decision—whether factually or legally flawed or even 'silly'—is irrelevant." *Id*. at 707 (citing *Garvey*, 532 U.S. at 509).  Ultimately, *Konop* undercuts, rather than supports, Greene's arguments.

Greene raises other jurisdictional challenges to the System Board's Award. For two reasons, Greene says that his arbitration was not properly before the System Board.  First, a four-person Board did not meet and attempt to resolve Greene's termination before the third-party neutral was added.  *See* [DN 3-1 at 2.] Normally, grievances must go before a four-person board, consisting of two UPS members and two IPA members, before a neutral arbitrator is added.  However, in termination cases, both the RLA and CBA provide that the parties may skip the four-person board and go directly to binding arbitration, as they did in this case. Second, Greene previously filed a grievance stating that UPS did not have objective evidence to order an additional medical exam, and that grievance had not been resolved at the time of the arbitration.  *See* [*id*.]  But Arbitrator Winograd

specifically considered and rejected this argument.   *See* [DN 19-15 at 46-47.]   In doing so, Winograd interpreted the CBA, stating:

> Nothing in Article 5.D provides for advance review in a grievance proceeding to test the validity of a Company directive for a medical examination.  If an employee declines to comply, an opportunity remains under the contractual grievance and arbitration machinery for full consideration of the directive and an employee's objections to discipline, as in the present proceeding.

[*Id.*]   The Court must defer to this interpretation, just as it defers to Winograd's interpretation of the CBA's medical exam provision.

Deference aside, Greene waived these jurisdictional arguments at the very outset of the arbitration.   Arbitrator Winograd asked the parties whether they were ready to proceed with the arbitration, and all those present assented.   [DN 13 at 5.]   Greene again waived this argument in his post-hearing brief, stating that "[t]his matter is properly before the Board." [DN 19-10 at 5.]  Parties to arbitrations "ha[ve] an affirmative obligation to present to the arbitrator any arguments why the arbitration should not proceed.   [They] cannot sit idle while an arbitration decision is rendered and then, if the decision is adverse, seek to attack the award collaterally on grounds not raised before the arbitrator." *United Steelworkers of Am., AFL-CIO-CLC v. Smoke-Craft, Inc.*, 652 F.2d 1356, 1360 (9th Cir. 1981) (citing *Cook Indust., Inc. v. C. Itoh & Co. (Am.) Inc.*, 449 F.2d 106, 107-08 (2d Cir. 1971), *cert. denied*, 405 U.S. 921 (1972)).   This is precisely what Greene attempts to do now, to no avail.

When federal courts vacate RLA arbitrations, it is typically because the System Board exceeded the boundaries provided by the collective bargaining

agreement.   In determining what those boundaries are, the arbitrator is afforded a great deal of deference.   If the decision even arguably falls within the scope of the agreement, courts may not second-guess the arbitrator's determination.   Here, Arbitrator Winograd interpreted the parties' CBA, and his interpretation was not "wholly baseless and without foundation and reason."   *Schneider*, 822 F.2d at 24. Therefore, this Court may not overturn the System Board's Award based upon the second ground of review contained in 45 U.S.C. § 153 First (q).

 (3) *Fraud or Corruption*

Finally, Greene may prevail by showing that the System Board's Award was a product of "fraud or corruption."   *Union Pac. R. Co. v. Sheehan*, 439 U.S. 89, 93 (1978).   Not just any fraud or corruption will do, however.   The RLA states that "the order of the division may be set aside . . . for fraud or corruption *by a member of the division making the order*."   45 U.S.C. § 153 First (q) (emphasis added). Stated otherwise, "Fraud in this context is understood to mean fraud by a member of the Board, not fraud by a party."   *Green v. Grand Trunk W. R. Inc.*, 155 F. App'x 173, 176 (6th Cir. 2005) (citations omitted).   The RLA does not define fraud, but "complete unwillingness by a Board member to respond to any evidence or argument in support of one of the parties' positions would constitute fraud."   *Id.* (citing *Pac. & Arctic Ry. & Nav. Co. v. United Transp. Union*, 952 F.2d 1144, 1148 (9th Cir. 1991)).

Here, while Greene accuses most every person and entity involved in this case of fraud, corruption, and perjury,[6] the bulk of his accusations are levied at the parties and witnesses before the System Board and this Court, not the Board members themselves.   Even if UPS and IPA did, as Greene believes, manufacture the evidence presented against Greene during the arbitration proceedings, this Court would still not have the power to overturn the System Board's decision based upon fraudulent conduct.   At the very least, to survive summary judgment, Greene must show that not only did UPS and IPA present fraudulent evidence, but also that "the [System Board] knew or should have known that the case he was there to support was tainted by fraud." *Woodrum v. S. Ry. Co.*, 750 F.2d 876, 882 (11th Cir. 1985), *cert. denied*, 474 U.S. 821 (1985).   Although Greene strenuously contests the grounds upon which the System Board decided his case, no evidence supports the proposition that the Board members knew or should have known that UPS and IPA were engaged in fraud or corruption.

When Greene does allege that Arbitrator Winograd engaged in fraud, he is essentially just stating his disagreement with the Board's findings.   In his response, Greene lists thirteen "Arbitrator Acts of Misconduct."   [DN 50 at 24-26.] But the acts that Greene lists are largely nothing more than adverse procedural and evidentiary rulings, which this Court does not have the power to second-guess.   On another occasion, Greene quotes the portion of Arbitrator Winograd's decision referring to Greene's "readiness to take painkilling drugs and injections," [DN 19-15

---

[6] In his response alone, Greene uses "fraud" and its derivations 140 times; "corrupt" and its derivations 28 times; and "perjury" 12 times.   *See* [DN 50.]

at 31], arguing that "[n]othing in the record supports the inference that those medications remotely affected Greene's judgment or performance."   [DN 50 at 46.] But the issue in the arbitration was not whether the medications actually affected Greene's ability to fly, but rather, whether UPS could require Greene to undergo a medical exam to see if he was able to fly.   Furthermore, because Winograd characterized UPS's investigation as "sufficiently fair and thorough," Greene claims that Winograd "is guilty of blatant complicity with UPS and the IPA to target the Plaintiff."   [DN 50 at 48.]   This is not fraud.   Rather, Greene is simply trying to repackage his disagreement with the substance of the arbitrator's decision under the guise of fraud and corruption.

Greene does occasionally put forth arguments that, if true, would support a finding of fraud.   For example, Greene states that "Arbitrator was guilty of fraud on multiple accounts purposely fabricating statements Plaintiff never made and manufacturing false claims out of thin air."   [*Id.* at 26.]   But Greene fails to cite to any evidence in the record demonstrating that the arbitrator "purposely fabricat[ed]" Greene's statements. [*Id.*]   Greene's claims of fraud regarding Arbitrator Winograd are mere conclusory statements, unsupported by any material evidence giving rise to a genuine dispute of material fact.   Because Greene "brings forth no evidence that any Board member refused to consider his claims," *Grand Trunk W. R. Inc.*, 155 F. App'x at 176, he may not overturn the System Board's Award under the third ground of review stated in 45 U.S.C. § 153 First (q).

32

## IV. Conclusion

As the Supreme Court stated in *Sheehan*, "The effectiveness of the Adjustment Board in fulfilling its task depends on the finality of its determinations." *Union Pac. R. Co. v. Sheehan*, 439 U.S. 89, 94 (1978). Mandatory, binding arbitration under the RLA is designed to provide companies, employees, and unions with a reliable and efficient means of resolving labor disputes. To carry out this goal, reviewing courts may vacate an RLA arbitration only in the most extreme circumstances. The limited scope of review provided for in 45 U.S.C. § 153 (First) (q) prevents courts from being dragged into the quagmire of often messy factual scenarios. It also preserves the expectations of the parties who negotiated the terms of their respective collective bargaining agreements. This Court is called to decide only whether UPS, IPA, and Greene got what they bargained for, not whether the ultimate outcome was the factually correct one.

Here, the parties received precisely what they should have expected: a reasoned decision by a neutral arbitrator who weighed the evidence, interpreted the terms of the CBA, and rendered a decision that fairly reflected the provisions of that agreement. Thus, the Court's inquiry must cease. As his filings make clear, Captain Greene feels that he has been slighted by the other parties in these cases. But the exceedingly narrow review allowed in cases of this type prevents the Court from expressing an opinion regarding Greene's beliefs. Greene had the opportunity to raise his factual arguments before the System Board of Adjustment; he may not do so now. UPS and IPA have shown that no genuine dispute of material fact

exists with respect to any of the three permissible grounds for review of the System Board's Award, and Greene has failed to rebut that showing.   Therefore, UPS and IPA are entitled to summary judgment.

An appropriate order will follow.

CC: Counsel of Record
Douglas Greene, *pro se*